## ASSESSMENT OF BANK SHARES FOR TAXATION.

Common Pleas Court of Cuyahoga County.

SAMUEL DOERFLER V. STATE. TAX COMMISSION ET AL..

Decided, December 16, 1918.

*Taxation—Limitation on the Power of the State to Raise Revenue by—*
*Bank Shares Not Taxable at Market Value—Franchise and Good*
*Will Not Taxable as Property—Revision of Tax Valuation Pro-*
*ceedings.*

1. The capital stock of banks is improperly assessed for taxation ac-
   ·cording to the market value of the shares, subject as they are to
   speculative fluctuations and intangible values.
2. The corporate franchise or good will of a bank can not be regarded
   as property for purposes of taxation.
3. Article XII of the state Constitution is a limitation upon rather than
   a delegation of power to raise revenue by taxation.
4. The term "revision" as used in the title of act 107 O. L., 551, pro-
   viding for revision of the orders of tax commissioners, does not
   require courts of record, in the absence of records filed with pe-
   titions in error, to perform the ministerial duties of an. assessing
   board.

FORAN, J.

This case comes into this court under favor of an act of the
General Assembly, passed March 21, 1917, and strange as it
may seem, approved by the governor as passed; 107 O. L., 551.
The title of the act, which the Constitution (Article II, Section
16) provides shall be clearly expressed in its title, is as follows:

"To supplement Section 5611 of the General Code, by the
enactment of Sections 5611-1 and 5611-2 providing for the re-
vision by the *Supreme Court* of the orders of the Tax Commission
of Ohio relating to the valuation of property for taxation."

By the word "revision" is undoubtedly meant that the Su-
preme Court was to be empowered to review the order of the
State Tax Commission. Review, as a legal term, means to ex-
amine again and revise, as an appellate court reviews a decision

or judgment of an inferior court, or as a superior court reviews the decision or judgment of an inferior court; and the conclusion of the superior court on review is the revision of the thing reviewed. Or, to state it differently, the revision is the completed act of the reviewing court. Looking into the act itself and the language employed or used to express the legislative intent, we obtain a vague hint for this confusing and inept misuse of words. By Section 2 of the act (Section 5611-2, G. C.) it is provided that the proceedings to obtain a *review* or modification of the order of the tax commission "shall be by petition in error filed in the court of common pleas," but it is further provided in the same section that, in addition to the certified transcript of its final order, which the tax commission is required to deliver to the person filing the petition in error, the court in which it is filed "may call witnesses and consider other evidence in addition to such transcript in the hearing on such petition in error."

Very naturally, the question is presented whether the proceeding now before the court is on appeal or in error. Manifestly it can not be both, as the two proceedings are clearly inconsistent. A petition in error is a new action to reverse the judgment below, but an appeal is in the circuit (Ohio) court the same action as in the lower court or court of common pleas. *Foster* v. *Barnes*, 63 Ohio St., 169, 172. An appeal is a proceeding in the original case, which continues the case by suspending the decree of the lower court until final hearing in the appellate court. *Teaff* v. *Hewitt*, 1 Ohio St., 511.

However, this anomalous incongruity occasions no surprise, as consistency is rarely, if ever, found in the intellectual jewel casket of the modern state legislator; and yet there may be some excuse for the bewildering chaos of the legislative mind.

As the law existed in 1916, when this cause of action, if it may be so called, arose, the tax commission had power to increase or decrease the value of banks' shares in order to establish equality and uniformity, as returned and fixed by the county auditor under favor of Section 5412, G. C. As the conclusion or determination of the tax commission was final, it

was deemed advisable to provide for a review of some kind if the order of the commission resulted in inequality or injustice to the state or to the banks. How was this to be done? If the courts were given appellate jurisdiction, they would be required to perform duties in no respect judicial. As has been pointed out, by appeal in law we mean that the decision of a lower court is referred or taken to a higher court for re-examination or hearing upon the merits *de novo*. To require a court to determine the valuation of property for purposes of taxation would be conferring upon the court mere ministerial functions to perform acts prescribed by law without dependence in any way upon judicial discretion as to the propriety of the conclusions reached; thus, in effect, conferring upon judges the duties of assessors or other tax officers.

To avoid a situation so obviously incongruous, the proceeding to review or modify the orders of the tax commission is called a proceeding in error, or a proceeding instituted by filing a petition in error, that is, in the instant case, a proceeding to review mistakes or errors of law by the tax commission, in wrongfully applying or interpreting or construing the statutes relating to taxation. But here a seemingly insuperable difficulty arose. As the law stood in 1916 (Section 5619, G. C.), the tax commission could increase or decrease the value of shares as fixed by the auditor, and under favor of Section 5623, G. C., its orders are final or binding, and while it could consult the Attorney-General and prescribe uniform rules respecting the mode or manner of exercising the powers conferred upon it, still, as these powers are far-reaching, a suspicion prevailed in 1916, and still prevails, that the tax commission may, in large measure, become a star chamber tribunal and receive information it need not necessarily make part of its public records.

This is quite evident from the certified transcript now before the court. This transcript does not contain a particle of evidence or give a single reason why it reduced the value fixed by the county auditor on the shares of one of the defendants in error; that is, "the value of the shares and property representing capital employed by The Union National Bank." For these

reasons it was deemed necessary, and, in the opinion of the General Assembly, essential, to go behind the mere finding and order of the tax commission, and to this end the common pleas court "may call witnesses and consider other evidence in addition to the transcript in the hearing of *such petition in error*."

It may be said, in passing, that without such additional evidence in the case now before the court, the plain duty of the court, if it had to pass upon the issue presented by the transcript alone, would be to dismiss the petition in error. Hence the case is squarely before the court on appeal under a statute providing for a proceeding in error in the Supreme Court, as indicated in the title to the act. Inasmuch, however, as the constitutional provision requiring that the title of a bill shall be clearly expressed in its title has been held to be directory in *Pim* v. *Nicholson*, 6 Ohio St., 176, this paradoxical *faux pas* will be treated not as a *faux jour*, but as a true light thrown upon a cubic picture or painting of the legislative mind.

The facts, as conceded and admitted by counsel in argument and in their briefs, are that in May, 1916, The Union National Bank, one of the defendants in error, furnished the auditor of Cuyahoga county the information regarding its resources and liabilities and stockholders, as required and provided by Section 5411, G. C. Proceeding under Section 5412, G. C., the auditor thereupon fixed the value of the shares and property of the bank and reported the valuation so fixed and determined by him, to the State Tax Commission, as provided by Section 5417, G. C. (since repealed by act 106 O. L., 269). The bank reported that 20,000 shares of stock were outstanding and that the market value of these shares on the day the report was made, June 1, 1916, was $187 a share. The auditor found from a consideration of the report of the bank and other sources, an affidavit perhaps of the president of the stock exchange, that the market value of these shares on the listing day for banks, between the first and second Monday in May, was $187, and that the total value of the 20,000 shares was therefore $3,740,000, and so reported to the tax commission.

On September 11, 1916, the tax commission made an order which, so far as relevant, is as follows:

"The commission, coming on to consider further the returns of banks made to the county auditors, and as reported by the county auditors to the commission, and having carefully examined such additional returns, and having heard all complaints made concerning the value of the shares and of the property representing capital employed, as fixed by the county auditors, and having carefully and fully considered the same, it is ordered that the total value of the shares of (the Union National Bank of Cuyahoga county is $3,417,130)."

It will be seen that the tax commission made a reduction of $322,870. As to why this deduction was made, the transcript or record is absolutely silent, but it is admitted by counsel that the valuation of the tax commission is based upon the book value of the shares.

Book value is defined by the tax commission in circular 136, issued April 7, 1916, as follows:

"The book value should be ascertained by adding together the capital, surplus and undivided profits, from the total of which should be deducted the item of current expenses and taxes paid, the remainder being the book value of the entire capital."

The Constitution does not permit banks or bankers to deduct their debts from their moneys and credits. *Exchange Bank* v. *Hines*, 3 Ohio St., 1; *Ellis* v. *Linck*, 3 Ohio St., 67. Book value does not include the value of the real estate owned by the bank, as real estate is assessed under Article XII, Section 2, of the Constitution, and banks under Section 3 of this article, which latter section provides, however, that the "credits and effects" of banks shall be taxed so that real estate held only by limited title, as a mortgage or otherwise held as security for money loaned by the bank, is included in the book value. To avoid double taxation and conform to the constitutional provisions, the auditor, by Section 5412, G. C., is required to deduct the value of the real estate on the tax duplicate, owned by banks, from the value of the shares. Besides, it must be remembered that many banks transact their business in leased premises and do not own the real estate upon which the banks are located.

Obviously, the shareholders have an interest in the real property owned by the bank, and upon liquidation, this interest is available to them in proportion to their holdings. But for the purposes of taxation it can not be considered as part of the book value of the shares.

The real question, then, before the court is: Shall shares of banks whose capital or capital stock is divided into shares, be assessed for taxation at their market value or at their book value, or by some other practical equitable mode of assessment?

Article XII of the Constitution, so far as applicable, is as follows:

"Section 1. No poll tax shall ever be levied in this state.

"Sec. 2. Laws shall be passed, taxing by a uniform rule all moneys, credits, investments in bonds, stocks, joint stock companies, or otherwise, and also all real and personal property, according to its true value in money.

"Sec. 3. The General Assembly shall provide by law for taxing the notes and bills, discounted or purchased, moneys loaned, and all other property, effects or dues, of every description (without deduction) of all banks now existing or hereafter created, and of all bankers, so that all property employed in banking shall bear a burden of taxation equal to that imposed upon property of individuals."

Three propositions stand out prominently and explicitly clear in the limitation imposed by the Constitution upon the state in the exercise of its inherent taxing power:

*First,* the limitation extends only to property, that is, any tangible thing that can be subject to ownership;

*Second,* all property shall be taxed by uniform laws according to its true value in money;

*Third,* the property of banks and bankers, whether incorporated or not, shall bear no greater burden of taxation than property belonging to individuals.

The Legislature has explicitly recognized that the limitations extend only to property as defined in the first proposition. Tangible as here used, of course means anything capable of being possessed or realized in the sense that a man can lay his hands upon it, secure or grasp it.

Section 5321, G. C., provides that "personal tax" and tax on personal property includes all taxes excepting only the tax upon real estate.

Section 5325, G. C., provides that personal property "includes every tangible thing being the subject of ownership, whether animate or inanimate, other than money, and not forming part of a parcel of real property."

This section further provides that money loaned on pledge, or capital stock of all kinds, is personal property.

Section 5326 provides further that money includes all deposits in banks, which the depositor is entitled to withdraw on demand.

Article XII is not a grant or delegation of power to the state to raise revenue by taxation, but rather a limitation upon that power. The right of the state to raise revenue by taxation for public purposes is an inherent and absolutely indispensable incident or attribute of sovereignty, as without this power a civilized state could not exist or discharge its governmental functions. *Western Union Tel. Co.* v. *Mayer,* 28 Ohio St., 521; see especially page 533.

In the Constitution of 1802, no delegation of power was granted or delegated, to the state to raise revenue by taxation, except as found in Article I, Section 1, which provides that the legislative authority of the state shall be vested in the General Assembly. In the Constitution of 1851, and as we find it today, this inherent power indispensable to raise revenue for public purposes, is vested in the General Assembly. Article II, Section 1, *Western Union Tel. Co.* v. *Mayer, supra; Hill* v. *Higdon,* 5 Ohio St., 243; *State* v. *Ferris,* 53 Ohio St., 314, 330.

The Supreme Court has frequently recognized the right of the state to raise revenue by a tax upon certain occupations which, in the exercise of the police power, it is deemed expedient to regulate or control. Rights, franchises and privileges have also been taxed by license, as it is deemed in the exercise of the police power that certain occupations may be especially in need of public control, but revenue thus raised is not a tax upon property. *Western Union Tel. Co.* v. *Mayer, supra; State ex rel* v. *Ferris, supra; Baker* v. *Cincinnati,* 11 Ohio St., 534, 540;

*Adler* v. *Whitbeck,* 44 Ohio St., 539, 565; *Ashley* v. *Ryan,* 49 Ohio St., 504; and other cases might also be cited.

The Constitution, as amended in September, 1912, contains some grants of power, such as the right to receive or succeed to estates, the right to tax incomes, but even in these instances the laws must be uniform.

This phase of the subject under discussion is only referred to for the purpose of calling attention prominently to the fact that Article XII of the Constitution, that is, Sections 1, 2 and 3 thereof, are in no sense a delegation or grant of power, but are sharp and rigid limitations on the power of the state to tax *property,* in the sense we are now considering it. By reason of these limitations in raising general revenue, all property must be taxed without exemption or inequality of any kind, and any statute or rule of the tax commission, the county auditor or any board of revision, which would result in placing a greater burden of taxation upon one species or classification of property than upon another, would contravene not only these sections of Article XII, but also Section 2 of the bill of rights, which provides that:

"All political power is inherent in the people; government is instituted for their *equal* protection and benefit." *State* v. *Ferris, supra.*

On April 7, 1916, as already indicated, the State Tax Commission, under favor of Section 5624, G. C., issued to county auditors circular 136 as a uniform rule to govern them "respecting the manner of the exercise of the powers and discharge" of their duties. This section provides that the rules so presented and issued must be uniform rules. Circular 136, as far as applicable, is as follows:

"In fixing the value of the shares of national, state and unincorporated banks whose capital is divided into shares, county auditors are directed to fix the same upon the basis of the market value of such shares, if there is a market value for the same.

"The isolated sale of a small number of shares should not be considered as the market value, but the market value should only be taken where there is a sufficient number of sales of the

stock to indicate the value of the same as dealt in by purchasers and sellers of the stock.

"In all cases where the shares have no market value or are not dealt in generally, and in the case of unincorporated banks whose capital is not divided into shares, auditors are directed to assess the same upon the basis of the book value as represented by the return of the bank."

The rule prescribed in this circular was manifestly illegal and in contravention of the organic law of the state, for the reason that it prescribes a market value rule for shares "if there is a market value for the same," and a book value "in all cases where the shares have no market value or are not dealt in generally." There is surely a want of uniformity in this rule and it can be readily seen that in the application of the rule, injustice and inequality is quite probable.

It is a matter of common knowledge that there are many banks, the shares of which are so valuable that they seldom, if ever, are sold, even at private sale, and are never sold upon the stock exchange. They are what may be termed close corporations. In the smaller cities and villages of the state there are hundreds of incorporated banks having shares, most of which are owned by a few individuals or families as investments, and are not known or heard of in the trade marts, and are seldom, if ever, sold even at private sale. There are, for instance, in the city of Cleveland over 90 banks, about 50 of which are incorporated, the stock or capital being divided into shares. So far as known to the public through the medium of the press, the shares of not to exceed fifteen of these banks have any market value.

Market value, given in its broadest signification, means the value shown, fixed or estimated by public or private sales effected in the ordinary course of business, or a price established by public sales, or sales in the way of ordinary business, as of merchandise. *Murray* v. *Stanton,* 99 Mass., 348.

It should be remembered, however, that these definitions are subject to the qualification that the seller must be under no necessity to sell, and the buyer free to purchase or not, as he chooses. In other words, that the market must be an honest

market and not a speculative or trading market. If there is no record of public sales available to the auditor, how is he to ascertain or obtain information as to private sales? As a rule, men are not disposed to make public their private and personal affairs. Hence, if for any reason the shares of a bank are given a fictitious or trading market value, it will be readily seen that an inequality is more than likely to arise in listing some shares at their apparent market value, and others at their book value, in which event the organic law of uniformity would be practically nullified.

The real difficulty in this case is to determine what the framers of the Constitution meant by true value in money. The word "value" has a wide and at times an elastic meaning, and much learning has been expended by economists in defining its scope and application. It would be a waste of time and energy, however, and be of doubtful aid or assistance to consider the question from the economist's viewpoint. Generally and concretely speaking, value means worth. The phrase in the Constitution is not the true value or worth, but the true value in money. Does the addition of the word "money" mean the *price* of the property? If so, there is this distinction: that value is worth estimated by exchange of commodities in general, while price is worth estimated in money. Evidently the latter was the meaning intended by the framers of the Constitution. The object of construction as applied to written constitutions is to give effect to the intent of the people adopting them, that is, the voters or people approving the Constitution are presumed to have adopted and thus given effect to the intent of the framers of the organic instrument, but "this intent is to be found in the instrument itself." Cooley Con. Lim., 89.

In *Gibbons* v. *Ogden*, 22 U. S. (9 Wheat.), 1, 188, Marshall, C. J., said that the framers of a constitution and the people who adopt it,

"must be understood to have employed words in their natural sense and to have intended what they said."

The same view is expressed by Shauck, J., in *State* v. *Lynch*, 88 Ohio St., 71, 96.

A rule or perhaps a guide to construction, however, that should not be overlooked, is to determine, if possible, what, if any, evil or mischief, if any, did the constitutional convention of 1851 seek to remedy or prevent by imposing the limitations of Article XII upon the general or inherent right of the state to raise revenue by taxation. The thing which we are to seek is the thought which the language expresses and to ascertain this, resort must be had first to the natural signification of the words employed. As has been seen, the only limitation on the taxing power of the state found in the Constitution of 1802 is that the Legislature shall never pass a poll tax for county or state purposes. With this exception the inherent power of the state was unlimited.

An examination of Chase's statutes of 1825 shows startling inequalities and a glaring lack of uniformity in the exercise of the taxing power. See *Exchange Bank* v. *Hines,* 3 O. S., 1, 12. The confusing chaos of tax legislation as the constitutional convention of 1851 found it, was perhaps no greater than that found by the Legislature of 1917, when an emergency (not subject to referendum) act was passed. 107 O. L., 29. By this emergency act, twenty-five sections of the taxing laws were amended, seventy-seven sections repealed, and twenty-eight sections re-enacted. In Section 4 of this act, page 45, the Legislature declared that the emergency law was necessary for the preservation of the public safety, and that the necessity arose

"from the fact that recent judgments of the Supreme Court have declared unconstitutional many of the laws of Ohio providing for the valuation and listing of real and personal property for taxation, by reason whereof, the state and its political subdivisions are without adequate means for levying and collecting taxes for the year 1917 and the year thereafter."

No comment of the court upon this appalling condition is necessary.

By referring to the Debates of the Constitutional Convention of 1850-51, we find that the committee on finance and taxation in its first report provided, in Section 2, that

"The Legislature shall provide by law a uniform rule of assessment and taxation, and shall prescribe such regulations as

will secure a just valuation of all property, both real and personal.''

Section 4 as reported provided that

''The Legislature shall provide for taxing bank capital, and the issues of banks, railroad stock, turnpike company stock and canal company stock, the same as personal property is taxed.''

Debates Constitutional Convention, 1851, p. 513.

On December 9, 1850, it was proposed to levy taxes upon all residents of the state, in proportion to the amount of property and assets owned by each, deducting therefrom the debts owed by him. The day following, an amendment was proposed that the assessment and taxation should be according to the actual value of the property of every description.

On December 18th a substitute was proposed, the main idea of which was that

''The rule of taxation shall be equal and uniform throughout the state.''

On March 8, 1851, a select committee, to whom was referred the whole subject, reported it back with two amendments, the principal one of which was that

''Uniform laws shall be passed upon the subject of taxation, embracing all property according to its true value in money.''

On March 7, 1851, Section 3 was amended as it practically appears today.

An examination of the debates and the reports of the committee on finance and taxation of the convention of 1851 clearly indicates that the ruling and controlling idea was uniformity and equality, and that the phrase ''nothing can not be something'' is axiomatic in regard to taxation, or, in other words, that no man should be taxed for what he has not, but only taxed for that which he owns or has. The leading or dominant idea or thought in the mind of the convention was that taxation should be by ''uniform rule,'' based ''on a just valuation of all property, both real and personal.''

The distinction between capital employed in banking and other personal property was recognized. This distinction is readily understood. The capital employed in a trading or manufacturing enterprise or corporation, or a public service corporation, ordinarily consists of assets physical and tangible in character, such as machinery, appliances and appurtenances of all kinds, things that can be easily located, ascertained and seen. The assets of a banking company or association, whether incorporated or not, are more illusive, certainly not so patent and open to observation. These assets consist of moneys on deposit, surplus, loans, credits, investments, negotiable instruments and mortgages and collateral held as security therefor. The nature, character and amount of these assets is necessarily within the knowledge of the bank officials and those having business relations with the bank. Hence the constitutional convention deemed it wise, salutary and expedient that the General Assembly should provide by law that assets of this kind should

"bear a burden of taxation equal to that imposed upon the same amount of property, capital, money and credits and effects belonging to individuals."

Obviously the rule of uniformity as to classification and true value in money and as to rate provided by Article XII, Section 2, applies with equal force and is equally as binding upon the Legislature and listing and assessing offices in relation to the property of banks.

It would be interesting to follow the proceedings of the convention and note the evolution or development of Article XII into the form in which it finally appears, but as we are seeking only to obtain the viewpoint of the framers of these limitations, that will not be necessary.

On December 10, 1850, in a proposed amendment the question of value appeared for the first time in Section 2 and the words "actual value" were used. In a subsequent proposal the words "just valuation" appear.

On March 8, 1851, as has been said, the select committee to which was committed the question, reported Section 2, so far as now concerns the matter under consideration, practically as we find it today.

A substitute was at one time proposed that property should be taxed

"upon its value, which shall be ascertained in such manner as may be provided by law, making taxation equal and uniform."

While this was rejected, it is interesting to note that uniformity and equality was at all times dominant in the minds of the framers of the Constitution. Throughout all the debates and procedings of the convention, as has been indicated, three cardinal principles stand out prominently as controlling factors:

*First,* uniform laws only shall be passed upon the subject of taxation, embracing all property;

*Second,* all property shall be taxed according to its true value in money;

*Third,* banks shall bear a burden equal only to that imposed upon the property belonging to individuals.

If we bear these limitations in mind, a just determination of the question before us ought not to be difficult.

Owners of stock in Ohio corporations are not required to list the stock for taxation, Section 192 G. C. The property of the corporation being taxed, it would be double taxation to tax the stock which represents that property; but indirectly the stockholder does bear his share of the burden of taxation, as its payment by the corporation in a measure decreases the dividends paid the stockholder. While banks having shares pay this tax, as measured by the true value in money of the shares, still the effect is the same as in other corporations, as the bank deducts the amount of the tax paid from the share owners or holders, Section 5673 G. C. That is, their dividends are proportionately decreased or lessened. Manifestly, the law or rule taxing all personal property, including that of corporations, banks, incorporated or unincorporated, must be uniform, and this property must be assessed or listed at its true value in money.

If the contention of plaintiff in error is sound, then if a manufacturing or public service corporation has, for instance, outstanding 300,000 shares of stock, par or market value $100,

it should pay a tax on $30,000,000. If the market value of the shares was $150, then it should pay a tax on $45,000,000. In other words, if incorporated banks are taxed on the market value of their shares, uniformity requires the same rule shall apply to all corporations. We know this is not the rule in Ohio or in this county.

We think the case of *Cummings* v. *National Bank,* 101 U. S., 153, directly in point. Prior to 1879, the settled rule prevailed in a large part of the state of Ohio, by which real estate and ordinary personal property was listed or estimated at one-third of its true value, and moneyed capital at three-fifths of its true value. The state board of equalization of banks increased the valuation of the shares of the Toledo bank to their full value. The bank brought its bill in equity to enjoin the treasurer from collecting the tax so assessed. In part 2 of the syllabus, the Supreme Court of the United States hold,

"That the rule or principle of unequal valuation of different classes of property for taxation, adopted by local boards of assessment, is in conflict with that Constitution (Ohio), and works manifest injustice to the owners of bank shares."

The court say, page 157, in commenting on the Ohio statute providing for injunction against the collection of taxes illegally assessed:

"Independently of this statute, however, we are of the opinion that when a rule or system of valuation is adopted by those whose duty it is to make the assessment, which is designed to operate unequally, or to violate a fundamental principle of the Constitution, and when this rule is applied not solely to one individual, but to a large class of individuals or corporations, equity may properly interfere to restrain the operation of this unconstitutional exercise of power."

In *Exchange Bank* v. *Hines,* 3 Ohio St., 1, the court had under consideration an act of the Legislature providing for the taxation of banking companies. The court said in the opinion, page 15, that

"Taxing by a uniform rule requires uniformity, not only in

the rate of taxation, but also uniformity in the mode of the assessment upon the taxable valuation.''

And further, that

''the uniformity in the rule required by the Constitution does not stop here. It must be extended to *all property* subject to taxation, so that all property may be taxed alike, *equally*—which is taxing by a uniform rule.''

The language is plain and unmistakable. The uniform rule requires not only that the *rate*, but the *mode of the assessment* shall be uniform, and extends to *all* property subject to taxation.

The General Assembly evidently had these decisions in mind in 1917 when the emergency act was passed.

Section 5404, G. C., provides that the secretary or principal accounting officer of corporations shall list by oath of person listing, all personal and real property, including money and credits of all corporations, including banking corporations, necessary to the daily operation of the company, at their value in money.

Section 5405, G. C., provides that these returns shall be made to the auditor, who shall ascertain and determine the value of the property so listed, deducting the value of the real estate.

Section 5408, G. C., provides that all shares of incorporated banks and unincorporated banks whose capital is divided into shares, and

''the capital employed, or the capital representing it, in an unincorporated bank whose capital stock is not divided into shares,''

shall be listed and taxed at its true value in money. The word ''true'' as used means exact, just, accurate or conformable to reason. ''Actual,'' while it means practically the same as ''true,'' there is this distinction: actual is opposed to apparent or imaginary and relates to the present, as opposed to the past, that which really is, not that which can or may be.

In listing shares of banks, the future possibility of the shares, or what they can be worth or may be worth, must not be considered. It is the exact, just, accurate value at the time of list-

ing that must be taken into consideration by the listing officer. Obviously the rule of uniformity is infringed and contravened if incorporated banks are taxed upon the market value of their shares, and unincorporated banks or banking associations, whose capital is not divided into shares, are taxed according to book value. In one case a *certain* and absolute rule is fixed for banks whose shares are listed or quoted on the stock exchange, and another, an uncertain, illusive and indeterminate rule, dependent upon the honesty, veracity and good faith of bank officials, is necessarily fixed for the valuation of unincorporated banks or banking associations whose capital is not divided into shares. Unquestionably injustice and inequality must, in the nature of things, necessarily result from such a mode of assessment.

The market value of bank shares, as ascertained in a fair, honest market, that is, as such shares are ordinarily sold and purchased in the community in good faith, may be considered by assessing officers, boards of revision or the tax commission, as a factor in estimating their true value in money, but to use and consider the market value of the shares as the sole, only, controlling factor or guide in determining their true value in money, to the exclusion of all other considerations affecting their true value in money, would be an unfair, unstable and unreliable rule or mode of assessment to prescribe or follow, and would undoubtedly, in many instances, contravene Article XII, Section 3, of the Constitution, and impose upon banks having shares a burden of taxation grtater than that imposed upon property of individuals. The manifest effect of the limitations in Article XII, Sections 2 and 3, of the Constitution is to make *property* the sole basis for the taxation of banks and joint stock companies, and nothing is to be considered but the true value in money, so far as banks are concerned, of the notes and bills discounted or purchased, money loaned, property, effects and dues of the banks.

While a corporate franchise may, in some instances, be taxed under the general powers of the state, the taxation of the franchise of an incorporated bank is inhibited by Article XII, Section 3, of the Constitution.

In *Exchange Bank* v. *Hines, supra,* the court say on page 8, in construing Article XII, Section 2:

"A corporate franchise, therefore, being a mere privilege or grant of authority by the government, is not *property of any description,* and consequently not subject to taxation under the above provision of the Constitution."

In *State* v. *Ferris, supra,* the court distinctly approved this doctrine, and said, page 329:

"That a franchise is not property, within the meaning of said section (2), was held by this court, *for reasons which seem unanswerable,* in *Exchange Bank* v. *Hines,* 3 Ohio St., 1."

In *Exchange Bank* v. *Hines, supra,* the court was considering Article XII, Section 2, and assumed that this section was a grant of power, instead of a limitation of the power of the state to raise revenue, but the Supreme Court has since held that all three sections are limitations and not grants. Referring to the dictum in *Exchange Bank* v. *Hines,* that Section 2 contained a grant of power, Burket, J., said, in *State* v. *Ferris, supra,* at page 330:

"That such is not the true or correct construction of the Constitution is now universally conceded."

Or, in other words, as has been said, the three sections referred to are limitations, and not grants of power.

Obviously, if the franchise of a joint stock company or the corporations named in Article XII, Section 2, is not property, neither is the franchise of an incorporated bank. This is self-evident, and its franchise is not subject to taxation by reason of the limitation of Section 3.

Unincorporated banks may have a good will, but not a franchise right or privilege, and while it is admitted that different species of property may be classified and subjected to different modes of assessment, it must not be forgotten that the paramount result to be obtained is

"The ascertainment of the true value in money of the property embraced in the respective classes, and the taxation of all property by uniform rule." *State* v. *Jones*, 51 Ohio St., 492, 508.

All modes of assessment, no matter to what species or classification of property they apply, must have in view this result and no other. To assess the shares of incorporated banks at their market value as listed and quoted on a stock exchange, as was done in the instant case, and to assess the property, effects and assets of unincorporated banks by a wholly different rule, would necessarily be a violation of this fundamental constitutional principle. If, for instance, as under former statutes, real estate was valued by assessors or appraisers, personal property by oath of owners, subject to modification by equalizing or other officers, and bank shares by the auditor, upon sworn statement or returns of the bank president and cashier of the actual value in money of such shares, this diversity in mode of assessment for fixing the value for taxation of the different species of property is

"not *necessarily* in conflict with the provisions of the Constitution which require all property to be taxed by a uniform rule, and according to its true value in money." *Wagoner* v. *Loomis*, 37 Ohio St., 571.

But the court say in the opinion, page 580, by way of qualification,

"that an honest and intelligent discharge of duty by those intrusted with the execution of the respective modes provided by law, would accomplish all that was intended by the Constitution."

Or, as Dickman, C. J., said in *State* v. *Jones, supra,* the different modes of assessment should all have

"in view one result, the ascertainment of the true value in money of the property embraced in the respective classs, and the taxation of all property by a uniform rule."

The tax on a franchise is in its essential nature the same as the license tax.   In the case of a foreign corporation, the tax is exacted for the privilege of exercising its corporate powers in the state.   In the case of a domestic corporation, it is the amount paid as the price of its corporate existence.   Burroughs, Taxation, page 166.

Recognizing the right of a state to tax a franchise, it must be held, however, that by reason of the limitations of Article XII, Sections 2 and 3, of the Constitution, the corporate franchise of a bank can not be considered as property for purposes of taxation, as it is an intangible thing, a mere license or privilege, and in no sense tangible in the sense that notes, bills, moneys, effects, loans, securities, collateral and dues are tangible.

But is the market value the true value in money?   Possibly it might be if the market were an honest and a fair market, where bulls are not horning, bears growling or shorn lambs bleating; but a market value or price is not an honest value or price when effected, as it too often is, by operators, who, being long in a particular stock and desiring to sell, manipulate the market and raise prices, or, being short and desiring to buy, manipulate the market and lower prices.   Operators, by a series of wash sales, can easily depress or lower the price of a stock enormously, although the physical, tangible assets and property back of the stock are in no way affected by the slump.

In *Winnipiseogee L. C. & W. Mfg. Co.* v. *Guilford*, 67 N. H., 514, the New Hampshire statutes relating to taxation were under consideration.   These statutes require that

"The selectmen shall appraise all taxable property at its full and true value in money, as they would appraise the same in payment of a just debt due from a solvent debtor, or at its just value."

The Supreme Court of New Hampshire, in passing upon this statute, said that

"Such value is the market value or price which the property will bring in a *fair* market, after fair and reasonable efforts have been made to find the purchaser who will give the highest price for it."

Surely this is not a trading market value. A man desiring for some purpose to become a director in a bank, finds it necessary to secure a large block of the shares of the bank. He is willing and does give more than the true value in money for the shares, for the reason that he expects, by becoming a director, he may serve his own personal ends and be vastly more benefited in the end than by any loss he sustained in purchasing the stock at more than its true value, and yet, if he sends his agents upon the stock exchange to purchase the stock, the value of the stock may be enhanced by this personal, and not general, demand for the stock. If this should occur just before the listing day, then the other shareholders of the stock would be unjustly taxed if the market value was taken as the criterion of assessment.

If, for any reason, by a series of wash sales or otherwise, just prior to the day of listing, the shares of a bank should be depressed largely in value, the state would be the loser, if it adopted the market value basis as its sole mode of assessment.

Within the past few years, war conditions have tremendously affected the market price of stocks which were earning fair dividends. These stocks were sold in large blocks to raise money to put into "war bride" stocks. This had a tendency to lower the market price, although the *actual* value of the stock remained unaffected, as the dividends earned and paid remained unchanged. The court has in mind a particular instance of a public service corporation whose charges for service were affected by political considerations, as well as cost of operation. Costs of operation imperatively demanded in this instance, owing to war conditions, an advance in charge for service, but political promises and exigencies interposed a personal, selfish and unreasonable opposition. The *deus ex machina* of the political stage, openly suggested and advocated, to save an embarrassing situation, that the share owners contribute one-third of their dividends to the general public. This suggestion, morally dishonest and wholly insincere, together with prevailing war conditions, decreased the market price of this stock at least 15 points, but

the dividend earning ability of the corporation was wholly unaffected by these war conditions and sinister influences.

If the rule of fixing the value of the shares at their market price was adopted in this instance, the state would be the loser, and unjustly so, and under the circumstances, it can not be said that the market value was a fair and honest market value.

Again, the market price of bank shares is largely affected by the personal equation of good will. The personality of a bank president or manager may attract depositors as a magnet attracts iron, and thus enhance the good will of the institution, but then good will is not property within the meaning of the tax laws. It may be property as between the buyer and the seller of the good will, but it is not taxable property. It is not a right, franchise or privilege, nor is it personal property.

In *Western Union Tel. Co.* v. *Poe,* 61 Fed., 449-459, Taft, J., said:

"It would certainly cause a surprise and shock to the business community of Ohio to have it decided that it is the duty of every business firm and corporation to return for taxation the estimated value of its good will and the estimated value of the skill and experience and economical management of the employer and employe, or to use such factors of its profits to increase the taxation of its tangible business capital."

Our attention is called to the case of *State* v. *Jones,* 51 Ohio St., 492, and it is claimed the doctrine of this case is that a corporate franchise may be taxed, under Article XII of the Constitution. Counsel have evidently misconstrued the doctrine of this case. The most that this case, so far as the opinion is concerned, holds is, that the market value of capital stock has some relation to the value of the tangible property of the corporation, and that it has, to some extent, a reflex action on the value of the property. The court in this case had under consideration what are known as state corporations, deriving their powers directly from the state, under special laws or statutes, and not under the general corporation laws, with the right to do business in all parts of the state, and so far as telegraph and telephone com-

panies are concerned, the exclusive right of way throughout all parts of the state, and not necessarily subject to local control, at least without the consent of the municipalities through which their lines run and in which they do business. This case does not hold, either in the syllabus or in the opinion, that a franchise may be taxed under favor of Article XII, Sections 2 and 3, of the Constitution. In the opinion, the court does say, page 510, that

"Taking the market value of the entire capital as a *datum,* the board is only *guided* thereby in ascertaining the true value in money of the company's property * * *. The capital stock is clearly not the same as the property possessed by the corporation, for the capital stock remains fixed, although the *actual property* of the corporation varies in value and is constantly increasing or diminishing in amount."

As has been said, the most that this case holds is that the market value may indirectly enter into the true value in money of the tangible property and assets of the corporation, and may be considered as a factor in estimating the true value in money of the property owned and controlled by the corporation.

The Constitution of 1802 and 1851, and that as amended September, 1912, expressly prohibited the imposition of a poll or a capitation tax on the adult male population of the state. There is abundant reason for this, politically, economically and historically. A poll tax precipitated a rebellion in England in 1381, known as the Peasant Revolt. In England in early times a poll tax was graduated according to the *dignity* of the payer. In France in 1695 the classification for a poll tax was according to the estate and rank of the payer.

To tax good will would be to tax personality, dignity, honor and intelligence. Such a concept is hideously unthinkable, and yet market value is more or less influenced by good will, an intangible; unstable thing dependent upon personality, or reputation, which death, misfortune or accident or other calamity may render valueless in a few days. There are many decisions that cash value, actual value, market value and saleable value are

interchangeable and convertible terms, but an examination of these authorities will show that in most instances the courts had under consideration the value of real estate or personal property and not the value of stocks. The decisions in Ohio as to value have reference to the value of property where it arises upon indictment for a criminal offense.

In *State* v. *Yates*, 10 Dec. Re., 182 (19 Bull., 150), value was held to be the utility of an object, the worth of an object in purchasing other goods. The court here had under consideration the value of a dog.

In *Chidester* v. *State*, 25 Ohio St., 433, the word "value," as used in the code of criminal procedure, is said to be used in the sense of "effect," "import," and not in the sense of "worth in money." The court here was considering an indictment where forgery was charged.

In *Burdge* v. *State*, 53 Ohio St., 512, forgery was also under consideration, and it was said that the word "value," as used in the statutes, does not mean value in money, as between parties, but value or effect only as a legal instrument.

It should be borne in mind that the decisions of the Supreme Court herein quoted can not, strictly speaking, be regarded as precedents, except when applied to statutes practically similarly to those the court had under consideration in each particular case. These decisions can not be taken as applying to tax laws generally, unless this clearly appears from the rule or doctrine of the case decided.

Take, for instance, the case of *Western Union Tel. Co.* v. *Mayer*, 28 Ohio St., 521. The act under consideration required a foreign telegraph company to pay a tax on its gross receipts for the next year preceding the return for assessment. The telegraph company claimed that under the return made the auditor of the county, of its gross receipts, that practically four-fifths of the receipts so returned were for business which originated or terminated at a point or points outside of the state of Ohio. The court, however, said, in the eighth paragraph of the syllabi, that the provisions of this act were

"in effect, a charge for the *privilege* of exercising its franchises and powers with the state, graduated according to the amount of *receipts,*"

and in the seventh part of the syllabi, the court said that this privilege is not property within the meaning of the limitations of the Constitution.

In *State* v. *Jones, supra,* the court had under consideration the construction of practically the same sort of statute; or, in other words, the right of the state to tax, under its general inherent powers, the franchises or privileges of a corporation deriving its powers from what is termed a state franchise.

It seems exceedingly difficult to reconcile some of the reported cases in Ohio, construing Article XII, Sections 2 and 3, especially so far as they relate to uniformity in mode of assessment and true value in money. Obtaining the value of property by different modes of assessment for different classes or species of property, as gathered from these decisions, may not be repugnant to the letter, but it is clearly obnoxious to the spirit, of the Constitution. While statutes providing for 'or 'permitting such classifications or different modes of assessment are tolerated by the courts, they are not favored.

As was said in *Wagoner* v. *Loomis, supra,* the different modes of assessment for different classes or species of property was not

"*necessarily* in conflict with the provisions of the Constitution,"

requiring uniformity of rule as

"an honest and intelligent discharge of duty by those intrusted with the execution of the respective modes provided by law, would accomplish all that was intended by the Constitution." Page 580.

But suppose some taxing officials are dishonest or incompetent, the excuse and apology for the rule or holding of the Supreme Court fails, the doctrine becomes unsound, and the door to the realm of inequality is opened wide, and this is just what the Constitution seeks to prevent. The use of the qualifying

phrase "not necessarily in conflict," or that uniformity in the mode of assessing all species of property is not an indispensable requirement, in the sense that equality of taxation can not be otherwise secured, clearly indicates that the court did not intend to lay down a rule absolute—one without exception, as it is dependent upon the honesty and good faith of the taxing officials. That equality of taxation can be secured by different modes of assessing different species of property, providing tax officials honestly and efficiently perform their duties, is the essence of the doctrine of this case. It in no way contravenes the doctrine of *Exchange Bank* v. *Hines, supra,* which is really the landmark on this subject, as it is undoubtedly the best considered case on the provisions of the Constitution under consideration. The court was clearly of the opinion that no language in the Constitution was more important than the phrase "taxing by uniform rule," and the court said, page 15, that

"Taxing by uniform rule requires uniformity, not only in the rate of taxation, but also uniformity in the mode of assessment upon taxable valuation.   *   *   *   But the uniformity in the rule required by the Constitution does not stop here. It must be extended to all property subject to taxation, so that all property may be taxed alike, equally—which is taxing by uniform rule."

This doctrine has never been explicitly modified or overruled.

The qualification as to uniformity found in *Wagoner* v. *Loomis, supra,* is based upon the evident reluctance of the Supreme Court to declare taxing laws unconstitutional, for the reason that to do so creates fiscal emergencies that are likely to result in the bankruptcy of the state or its political sub-divisions. For the reason, in *State* v. *Jones, supra,* the rule that the presumption is in favor of the validity of the law is carried to the extreme.

That this principle is well recognized, is illustrated by the fact that some self-constituted association, acting under favor of the initiative clause of the Constitution, submitted an amendment providing for classification of property, which amendment

was adopted at the last state election. Another amendment, however, was submitted by the Legislature, amending Article XII, Section 2, empowering the Legislature to pass laws providing against double taxation, especially of real estate and the mortgage or debt secured by the real estate. Both these amendments were adopted. As they are inconsistent, both can not stand, as a Constitution inconsistent with itself, or containing inconsistent provisions, is legally unthinkable.

The tax legislation of the state seems to be in a condition of chaos and a condition worse than confounded. Aside from these inconsistent constitutional provisions, the legislation relating to taxation, as patched by the crazy quilt legislation and the emergency act of 1917, is a maze as confusing as the Egyptian Labyrinth described by Herodotus. Manifestly, the state needs a scientific revision and codification of its tax laws, by men who have breadth of vision and clarity of expression, and who have a thorough economic and legal knowledge of the subject, if it would escape economic fiscal complications and disaster.

It should be an axiom of taxation that nothing can not be something for the purpose of legitimate taxation, or, in other words, property for purposes of taxation must be a physical actuality. If an operator or speculator, long on some particular stock, bulls the market and raises the price ten points or more, the physical, visible, tangible property represented by the stock remaining unchanged or stationary, he, in effect, changes nothing into something, and a law or rule that would tax this nothing is unjust and contrary to the letter and spirit of the Constitution.

The first part of Adam Smith's second axiom is in this connection of paramount importance; that is,

"The tax which each individual is bound to pay ought to be *certain* and not arbitrary."

If the value of the shares of a bank are determinable by the fluctuations of a speculative market, subject to the sinister activities of individuals and not by a fixed law or rule, then the

tax is not certain, but arbitrary and in contravention of this universally accepted maxim.

Uniformity, certainty and equality of taxation is the essence of Article XII, Sections 2 and 3 of the Constitution, and we must hold that the contention of the plaintiff in error is subversive of these wise and salutary limitations. We fully appreciate that the auditor occupies an unenviable position. When banks report to the federal government, they are impelled of necessity to make the best possible showing and list their negotiable securities and instruments at their full value, but when they report to the auditor, they become like unto

> "A Niobean daughter, one arm out,
> Appealing to the bolts of Heaven,"

and strenuously insisting that these negotiable instruments, notes and securities are not of their full face value, but that, owing to changed financial conditions of the makers of the notes and signers of the securities, the value of the paper has decreased, even as the cat fish of Uncle Mose "am swunk."

It is axiomatic that the entire burden of taxation, as far as possible, should fall equally upon all classes and individuals, and be borne equally by all classifications and species of property, and that modes of assessment should show no trace of special incidence. Surely a just and a reasonable mode of assessment can be devised for listing personal property, including the shares of incorporated banks and unincorporated banks whose capital is divided into shares. In case disputes arise between the banks and the auditor, the board of revision or the tax commission, testimony should be taken and records made, and in case a petition in error is filed in the court of common pleas or other court, this record should be part of the transcript filed in the court of common pleas with the petition in error. If this was done, the grotesque spectacle of having a court of record perform ministerial duties as a mere assessing board would be obviated.

In view of the reasons advanced, we must hold that the act of the auditor in assessing the shares of the Union National Bank

solely according to their market value, as quoted upon the Cleveland Stock Exchange, is in contravention of statute and constitutional law. As we do not know upon what theory or basis the tax commission reduced the valuation fixed by the auditor, we are unable to say that there is any error in the record or transcript. We are not prepared to say that book value, as ordinarily understood, is the true or legal rule by which banks should be taxed. We can only say that it must be presumed that the tax commission, in reaching the conclusion it did, was acting in conformity with law, and for that reason the petition in error will be dismissed, and the plaintiff in error will be given an exception.

We desire to express our sense of obligation to counsel for their able presentation of the issues involved and their research in marshaling of authorities. We are under special obligation to counsel for plaintiff in error, whose knowledge of tax problems is profound and illuminating, and for his valuable assistance graciously rendered after the case had been heard and submitted. It was refreshing to have this member of the bar candidly intimate that he was more interested in the final adjudication of the question than in the matter of professional pride or official vindication.

As the question of jurisdiction, raised by counsel for defendant in error, is not likely to arise again under the statute, a decision thereon would be merely academic and of no practical utility.